# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **THE SUPERIOR BEVERAGE CO., INC.** | ) | **CASE NO.  4:05 CV 834** |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **SCHIEFFELIN & CO.** | ) | **MEMORANDUM OPINION** |
| *fka* **Schieffelin & Somerset Co.** | ) | **AND ORDER** |
| | ) | |
| **Defendant** | ) | |

----------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| **GOODMAN BEVERAGE CO., INC.,** *et al.* | ) | **CASE NO.  4:05 CV 868** |
| | ) | |
| | ) | |
| **Plaintiffs** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **SCHIEFFELIN & CO.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| **Defendant** | ) | |

This matter is before the Court upon the Order requiring the parties to address the potential applicability of the abstention doctrine established in <u>Louisiana Power & Light v. Thibodaux</u>, 360 U.S. 25 (1959).  <u>See</u> (Case No. 4:05 CV 834, Dkt. # 25; Case No. 4:05 CV 868, Dkt. # 24).

## I.    BACKGROUND[1]

The above-captioned actions arise from the Defendant, Schieffelin & Co.'s ("Schieffelin & Co."), efforts to terminate alcohol franchises operated by the plaintiffs, The Superior Beverage Co., Inc. ("Superior"), Goodman Beverage Co., Inc. ("Goodman"), and Mid-Ohio Wines, Inc. ("Mid-Ohio Wines"), pursuant to the Ohio Alcoholic Beverages Franchise Act (the "Act"), OHIO REV. CODE §§ 1333.82 - .87 (2005).

### A.    The Corporate Identity and Structure of Schieffelin & Co.

Möet-Hennessy, S.A. ("Möet-Hennessy"), a corporation of France, is the wine and spirits division of Louis Vuitton Möet-Hennessy ("LVMH"), likewise a French corporation. <u>See</u> (Dkt. # 31 at 2).  Möet-Hennessy has the right to distribute in the United States of America wines, sparkling wines, and champagnes, grown by non-party vineyard owners. Möet-Hennessy possesses the right to distribute, *inter alia*, Dom Perignon Champagne (a product of France), Möet & Chandon Champagne (France), Domaine Chandon still and sparkling wines (California), and Casa Lapostolle wines (Chile).

Möet-Hennessy formed a wholly-owned subsidiary, Möet-Hennessy, USA, a

---

[1] The following facts are binding for the exclusive purpose of resolving the issue of abstention.

Delaware corporation, in 1980 for the purpose of distributing wine and spirits in the United States.  See (Case No. 1:05CV868, Dkt. # 25 at 6).  Möet-Hennessy also acquired Schieffelin & Co., a Delaware corporation having its principal place of business in New York, as an importer and wholesaler of wines.  See (Case No. 1:05CV868, Dkt. # 25 at 6).  Möet-Hennessy caused Möet-Hennessy, USA and Schieffelin & Co. to merge, with the surviving entity being Möet-Hennessy, USA.  See (Case No. 1:05CV868, Dkt. # 25 at 6).  Möet-Hennessy, USA later changed its name to Schieffelin & Co.  See (Case No. 1:05CV868, Dkt. # 25 at 6).  As an indirect wholly-owned subsidiary of Möet-Hennessy, Schieffelin & Co. imported and distributed Möet-Hennessy's products in the United States.  See (Dkt. # 31 at 2).

In 1987, Möet-Hennessy entered into an agreement with Guinness Plc, a corporation of Great Britain, whereby the parties agreed to create a joint venture to manage the marketing, distribution and sale in the United States of their various brands and spirits.  See (Dkt. # 31 at 2).  Pursuant to the joint venture agreement, the parties created Schieffelin & Somerset ("S&S"), a New York general partnership, having two equal partners: (1) Schieffelin Partner, Inc., an indirect, wholly owned subsidiary of Möet-Hennessy; and (2) Somerset Partner Inc., an indirect, wholly owned subsidiary of Guiness Plc.  See (Dkt. # 31 at 2).  Schieffelin & Co. transferred to S&S all of its distributorship rights relating to Möet-Hennessy brands.  See (Dkt. # 31 at 2).

S&S imported and sold Möet-Hennessy brands in the United States from 1988 through 2004.  See (Dkt. # 31 at 3).  However, Diageo, Plc. (*fka* Guiness, Plc.) desired to terminate the S&S joint venture in order retain exclusive control over its brands.  See (Dkt.

# 31 at 3).    The parties consequently entered into an "Implementation Agreement" whereby S&S transferred the rights to Diageo, Plc. brands to Diageo North America, Inc., and Möet-Hennessy brands to Schieffelin & Co.  See (Dkt. # 31 at 3).  However, Schieffelin & Co. had terminated its distributorship licenses in 1988 thereby precluding any immediate transfer of S&S's distributorship rights in the Möet-Hennessy brands.  See (Dkt. # 31 at 3).  The parties ultimately agreed that they would transfer the brands on the "Schieffelin License Date," contemplated as January 1, 2005.  See (Dkt. # 31 at 3).

### B.    Schieffelin & Co.'s Distributorship Agreement with Superior

On April 27, 1978, Superior entered into an franchise whereby it became Schieffelin & Co.'s distributor in the Ohio counties of Columbiana, Mahoning, and Trumbull.[2]  See (Case No. 4:05CV834, Dkt. # 26 at 1).  Superior retained the franchise upon the creation of S&S. See id.

### C.    S&S's Distributorship Agreement with Mid-Ohio Wines and Goodman

On June 1, 1990, Mid-Ohio Wines entered into a franchise with S&S whereby Mid-Ohio became S&S's distributor in the Ohio counties of Ottawa, Sandusky, Seneca, Wyandot, Marion, Morrow, Crawford, Huron, Erie, Lorain, Ashland and Richland.    See (Case No.

---

[2]        Pursuant to pertinent Ohio law, a "distributor" is "a person who sells or distributes alcoholic beverages to retail permit holders in [Ohio], but does not include the state or any of its political subdivisions."  OHIO REV. CODE § 1332.82(C). A "manufacturer" such as Schieffelin & Co. is a "person, whether located in [Ohio] or elsewhere, who manufactures or supplies alcoholic beverages to distributors in [Ohio]."  OHIO REV. CODE § 1332.82(B). A "franchise" is "a contract or any other legal device used to establish a contractual relationship between a manufacturer and a distributor."  OHIO REV. CODE § 1332.82(D).

1:05CV868, Dkt. # 29).   In June 1995, Goodman, a related entity to Mid-Ohio Wines, began to act as the exclusive distributor of S&S products in Lorain and Erie counties purportedly with the knowledge and consent of S&S.  <u>See</u> (Case No. 1:05CV868, Dkt. # 29).

### D.    Schieffelin & Co.'s Attempted Termination of the Superior, Mid-Ohio Wines and Goodman Franchises

As anticipated upon the termination of S&S, Schieffelin & Co. applied on August 25, 2004 with the Ohio Division of Liquor Control for the license(s) required to distribute wines within Ohio.  <u>See</u> (Dkt. # 31 at 4).   Included with Schieffelin & Co.'s application were Territory Designation forms indicating that Superior, Mid-Ohio Wines and Goodman would serve as Schieffelin & Co.'s distributors within Ohio effective January 1, 2005.  <u>See</u> (Dkt. # 31 at 3).

On March 21, 2005, Schieffelin & Co. issued a letter to each of the plaintiffs advising that it was terminating their distributorship agreements pursuant to OHIO REV. CODE § 1333.85(D).[3]  <u>See</u> (Dkt. # 31 at 4).   The letters specifically provided, in pertinent part:

---

[3]        Ohio Revised Code Section 1333.85(D) provides:

If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand.  Any notice of termination or nonrenewal of the franchise to a distributor of the acquired product or brand shall be received at the distributor's principal place of business within the ninety-day period.  If notice is not received within this ninety-day period, a franchise relationship is established between the parties.  If the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal.  Upon termination or nonrenewal of a franchise pursuant to this

On January 1, 2005, Schieffelin & Somerset Co., a New York General Partnership assigned to Schieffelin & Co., a Delaware Corporation, all of its rights and obligations relating to the distribution in the United States of Hennessy, Moet & Chandon, Dom Perignon, Domain Chandon, Terrazas, Chandon Fresco, Green Point, Ruffino, Grand Marnier, Marnier, Chateau de Sancerre, Lapostolle and Casa Lapostolle and Navan.

This letter will serve as notice that, in accordance with Ohio Revised Code Section 1333.85(D), the relationship between Schieffelin & Co. and [Superior, Mid-Ohio Wines, and Goodman] is hereby terminated effective the close of business on March 30, 2005.

As of such date, Schieffelin & Co. will no longer supply you with any alcohol beverage products.  Also, as of that date, Schieffelin & Co. will repurchase your remaining inventory of alcohol beverages that we supplied to you and that are in marketable condition for resale ay your laid-in cost.

A company representative will contact you shortly to discuss statutory compensation under Section 1333.85(D).

See, e.g., (Case No. 1:05CV868, Dkt. # 1, Ex. A).

### E.    The Goodman / Mid-Ohio Wines's State Action

On March 28, 2005, Goodman and Mid-Ohio Wines filed an action in the Court of

Common Pleas, Lorain County, Ohio against Schieffelin & Co. asserting violations of the

Act.  See (Case No. 1:05CV868, Dkt. # 1, Ex. A).  Goodman and Mid-Ohio Wines

---

division, the distributor shall sell and the successor manufacturer shall repurchase the distributor's inventory of the terminated or nonrenewed product or brand as set forth in division (C) of this section, and the successor manufacturer also shall compensate the distributor for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer.  The value of the distributor's business that is directly related to the sale of the terminated or nonrenewed product or brand shall include, but shall not be limited to, the appraised market value of those assets of the distributor principally devoted to the sale of the terminated or nonrenewed product or brand and the goodwill associated with that product or brand.

additionally sought a temporary restraining order and preliminary injunction to "prohibt[] Defendant Schieffelin & Co. from terminating the franchise rights of [p]laintiffs [and] to continue to distribute certain alcoholic beverages supplied to them by the Defendant."  See (Case No. 1:05CV868, Dkt. # 1, Ex. B).

The parties entered into a stipulated temporary restraining order on March 30, 2005 effectually maintaining the status quo until the state court addressed the motion at an oral hearing scheduled for April 7, 2005.

### F.      The Superior Action

Superior meanwhile filed its action against Schieffelin & Co. in this Court, likewise asserting violations of the Act and requesting a temporary restraining order.  See (Case No. 4:05CV834, Dkt. # 1, Dkt. # 3).  This Court granted the motion for a temporary restraining order and scheduled the matter for a preliminary injunction hearing to be held on April 8, 2005.  See (Case No. 4:05CV834, Dkt. # 4).

### G.      Subsequent Procedural History

Schieffelin & Co. thereafter filed a Notice of Removal in the Goodman/Mid-Ohio Wines action in an effort to consolidate the related proceedings.  See (Case No. 1:05CV868, Dkt. # 1).    The parties to each action stipulated to an extension of the temporary restraining order in all cases until a June 2, 2005 preliminary injunction hearing.

### H.      Schieffelin & Co.'s April 29, 2005 Letters

Schieffelin & Co. issued letters to each of the plaintiffs on April 29, 2005 providing in pertinent part:

As you know, as of January 1, 2005, Schieffelin & Co. acquired the

rights to various brands . . . .Prior to January 1, 2005, [S&S] had the right to the MH [Möet-Hennessy] Brands.

[S&S] had concluded that it was in the best interest . . . that they be consolidated with one distributor in the State of Ohio, specifically Glazer's Distributors of Ohio, and its affiliated entities. [S&S] based this conclusion on a number of factors, including:

1. Glazer's elects to purchase at DI [direct import] pricing, which is lower than the prices at which your company elects to purchase from the warehouse in New Jersey. Consequently, Glazer's can sell at a lower price – and a uniform price – throughout the state.

2. Glazer's has relationships with national and statewide chains, so the MH Brands could be featured more often in advertising placed by national and statewide chains.

3. Glazer's sells a higher volume of the MH Brands. Consequently, Glazer's is better able to carry current vintage and current packaging.

4. Glazer's can offer statewide training.

5. In our view, Glazer's offers a more focused and better trained sales team than your company.

6. In our view, Glazer's has a greater likelihood of increasing the volume of sales of the MH Brands.

Following the transfer of the MH Brands to Schieffelin & Co., we decided to follow through on the decision to consolidate the MH Brands with Glazer's. Rather than exercise our right to terminate for cause under the [Act], Schieffelin & Co. decided to exercise its right to terminate your Franchise pursuant to the terms of Section 1333.85(D). We believed that our right to terminate under that Section was clear. Moreover, in view of your many years of representing the MH Brands, we believed that a termination pursuant to 1333.85(D) would provide you with appropriate compensation for your loss of the MH Brands.

Although we have now provided you with or offered to make available all of the documentation necessary for you to make your determination that, in fact, the rights to the MH Brands were transferred from one legal entity ([S&S]) to a different legal entity not under the same control (Schieffelin & Co.), you have persisted in insisting that Schieffelin & Co. does not have the right to terminate your Franchise pursuant to Section 1333.85(D).

We understand that a termination other than pursuant to Section

1333.85(D) requires just cause.  We also understand that just cause has been defined to mean the exercise of business judgment that is "neither arbitrary nor without reason." (Citation omitted.)

    . . . .

Our decision to issue this termination letter is neither arbitrary nor without reason.  We are terminating your Franchise for cause for the reasons outlined above.  The termination outlined in this letter will take effect 60 days from the date of this letter, unless the Franchise is earlier terminated pursuant to a court ruling in the pending litigation.

<u>See</u> (Case No. 1:05CV868, Dkt. # 20, Ex. A ).

## I.      The Instant Proceedings

Upon receipt of the April 29, 2005 letters**,** Goodman and Mid-Ohio Wines filed motion for contempt and to extend discovery relating to Schieffelin & Co.'s newly asserted basis for terminating the franchises.[4]   During a telephonic hearing on May 25, 2005, the Court denied the motion for the contempt and agreed to extend discovery.  Additionally, the Court raised the issue as to the potential applicability of the abstention doctrine established in <u>Louisiana Power & Light v. Thibodaux</u>, 360 U.S. 25 (1959). The Court requested briefing on the issue.

The instant filings ensued.

---

[4]      Subject to limited exceptions, such as the "successorship" exception provided in Ohio Revised Code Section 1333.85(D) (of which Schieffelin & Co.'s March 21, 2005 letter made reference), "no manufacturer or distributor shall cancel or fail to renew a franchise or substantially change a sales area or territory with out the prior consent of the other party for other than just cause and without at least sixty days' written notice to the other party setting forth the reasons for such cancellation, failure to renew, or substantial change."  OHIO REV. CODE § 1332.85.

## II.  LAW AND ANALYSIS

### A.  Subject Matter Jurisdiction

The district court has a "continuing obligation" to enquire into the basis of subject-matter jurisdiction to satisfy itself that jurisdiction to entertain an action exists. Nationwide Mut. Ins. Co. v. Cisneros, 52 F.3d 1351, 1361 (6th Cir.1995). "Unlike other issues not involving the merits of a case, subject-matter jurisdiction may be raised at any time, by any party or even *sua sponte* by the court itself." Franzel v. Kerr Mfg. Co., 959 F.2d 628, 630 (6th Cir.1992); accord FED. R. CIV. P.12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Jurisdiction may not be presumed and may not be gained by consent, inaction, or stipulation. See Sweeton v. Brown, 27 F.3d 1162, 1168 (6th Cir.1994). This is particularly so in removal actions, where "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded [to the state court]." 28 U.S.C. § 1447 (c).

Superior and Schieffelin & Co. invoked this Court's subject matter jurisdiction citing the diversity of citizenship between the parties. Federal courts possess diversity jurisdiction over suits between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs." See 28 U.S.C. § 1332 (a). In regard to the Goodman/Mid-Ohio Wines action, title 18 of the United States Code, section 1441 provides, in pertinent part:

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States may have original jurisdiction, may be removed by the defendant or the

defendants, to the district court of the United States for district and division embracing the place where such action is pending . . . .

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. §1441. The determination of diversity jurisdiction in a removed case generally is made as of the time of removal. See Dawalt v. Purdue Pharma, L.P., 397 F.3d 392 (6th Cir. 2005).

It is undisputed that the parties are citizens of different states for diversity purposes. The issue remains as to whether these matters exceed the $75,000.00 amount in controversy requirement.

Superior's "Amended Verified Complaint for Declaratory Judgment; Breach of Contract; Damages; Injunctive and Other Relief" seeks: (1) an order declaring that Schieffelin & Co. violated various provisions of the Act; (2) "temporary and permanent injunctive relief prohibiting Defendant from cancelling its franchise"; (3) "damages in excess of $75,000.00 proximately caused by the conduct of [Schieffelin & Co.] in violating [the Act] and the contract between [Superior and Schieffelin & Co.]; and (4) costs. See (Case No. 4:05CV834, Dkt. # 27). Goodman and Mid-Ohio Wines's "Amended Verified Complaint for Declaratory Judgment, Damages, Injunctive and Other Relief" requests relief similarly to that advanced by Superior. Specifically, Goodman and Mid-Ohio Wines seek: (1) an order declaring that Schieffelin & Co. violated various provisions of the Act; (2) "temporary and permanent injunctive relief prohibiting Defendant, Schieffelin & Co. from cancelling its franchises"; (3)

an order requiring Schieffelin & Co. to specifically perform under the contract; and (4) monetary damages in an undefined sum for violations of the Act and breach of the parties' contract. See (Case No. 1:05CV868, Dkt. # 27).

The Court recognizes that Superior's amended complaint explicitly requests damages in excess of $75,000.00. The Court further recognizes that it is undisputed that the declaratory and injunctive relief sought by all plaintiffs is valued at an amount in excess of $75,000.00. See (Case No. 1:05CV868, Dkt. # 1, Ex. D); see, e.g., Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."). The parties therefore have complied with the jurisdictional prerequisites for invoking this Court's diversity jurisdiction.

The parties nonetheless have neglected to address the import of Ohio Revised Code Section 1333.87 which provides:

> Any manufacturer or distributor who directly or through an officer, employee, or agent violates sections 1333.82 to 1333.86 of the Revised Code is liable to the party injured by such violation for all reasonable damages sustained by the party that are the proximate result of the unlawful act of the manufacturer or distributor, his officer, employee, or agent. An action to recover such damages and for other relief may be brought only in the common pleas court in the county in which the distributor's principal place of business in this state is located.

OHIO REV. CODE § 1333.87.[5]  The gravamen of the plaintiffs' amended complaints is that

---

[5]     Schieffelin & Co. discusses section 1333.87 in an effort to demonstrate that the Act does not provide for injunctive relief. (Dkt. # 31 at 5-7.) Remarkably, Schieffelin & Co. characterizes the provision as a "statutory forum selection clause," (Dkt. # 31 at 6), but fails to address the jurisdictional issue.

Schieffelin & Co. violated the termination provisions of the Act.  It follows *a fortiori* that any damages sought by the plaintiffs arise from the alleged violations of the Act.[6]  The plain text of section 1333.87 appears to vest exclusive jurisdiction over such claims in the Ohio courts of common pleas.

There lacks any authority interpreting the applicability of section 1333.87.  Prior to 1990, the section provided:

> Any manufacturer or distributor who directly or through an officer, employee, or agent violates sections 1333.82 to 1333.86 of the Revised Code is liable to the party injured by such violation for all reasonable damages sustained by the party that are the proximate result of the unlawful act of the manufacturer or distributor, his officer, employee, or agent. ***An action to recover such damages and for other relief may be brought only in a court of competent jurisdiction in this state***.

OHIO REV. CODE § 1333.87 (1988) (emphasis added).  For reasons that are undocumented in legislative history, and which this Court declines to divine, the Ohio General Assembly amended the statute to remove "court of competent jurisdiction in this state" in favor of the present text, "common pleas court in the county in which the distributor's principal place of business is located."  See (143 Ohio Laws, Part I, 1278-79).  The Supreme Court of Ohio has expressly declined to address the effect of the amendment.  See Tri County Distrib., Inc. v. Canandaigua Wine Co., Inc., 68 Ohio St. 3d 123, 129, 623 N.E.2d 1206, 1210 (1993) (emphasis added).  The court, however, characterized the amendment as "vesting [] *exclusive jurisdiction* in the Ohio county courts of common pleas."  Id.  Notwithstanding the seemingly

---

[6]    While the plaintiffs seeks monetary damages arising from the contracts, an examination of the amended complaints reveals that the any breach of contract claim arises by operation of the Act.  Therefore, any damages sought for a breach of contract likewise arise under the Act.

exclusive nature of the section 1333.87's jurisdictional grant to the Ohio courts of common pleas, at least three federal courts have addressed the merits of damages claims arising under the amended version of the Act.  See Dayton Heidelberg Distrib. Co., Inc. v. Vineyard Brands, Inc., 108 F. Supp. 2d 859 (S.D. OH.), aff'd, No. 01-4061, 2003 U.S. App. LEXIS 17936 (6th Cir. Aug. 25, 2003); Jameson Crosse, Inc. v. Kendall Jackson Winery, LTD., 917 F.Supp. 520 (N.D. OH 1996) (Dowd, J.).  As with the Ohio courts, none of the foregoing federal cases have explicitly addressed the apparent exclusive jurisdiction created by section 1333.87.

This Court is inclined to interpret section 1333.87 as vesting exclusive jurisdiction in the Ohio courts of common pleas over claims arising from unlawful violations of the Act, particularly where the plaintiffs seek monetary relief.  However, as discussed *infra*, the dearth of Ohio authority interpreting this statute counsels against this federal Court from injecting its interpretation into this paramount issue of state interest.  Indeed, the unsettled jurisdictional question is but one of the myriad of exclusively state-law issues that compels the Court to stay its hand in this matter.

### B.     Abstention

The United States Supreme Court repeatedly has admonished the federal courts to respect the efforts of state governments to ensure uniform treatment of essentially local problems.  See  Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996); Thibodaux, 360 U.S. at 28 (Stewart, J., concurring).  Principles of federalism and comity require no less.  See Quackenbush, 517 U.S. at 728.  Federal courts should thus "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their

domestic policy." Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943) (internal quotation marks omitted). And the federal judiciary should accordingly abstain from deciding cases (1) that present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or (2) whose adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989) (NOPSI) (internal quotation marks omitted). Though "abstention from the exercise of federal jurisdiction is the exception, not the rule," Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976), its importance in our system of dual sovereignty cannot be underestimated. It safeguards our federal system from the "delay, misunderstanding of local law, and needless conflict with a state policy" that inevitably result from federal judicial intrusions into areas of core state prerogative. Burford, 319 U.S. at 327. Accordingly, federal courts have the power to refrain from hearing cases that would interfere with a pending state criminal proceeding, see Younger v. Harris, 401 U.S. 37 (1971), or with certain types of state civil proceedings, see Huffman v. Pursue, Ltd., 420 U.S. 592 (1975); Juidice v. Vail, 430 U.S. 327 (1977); cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law, see Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941); cases raising issues "intimately involved with [the States's] sovereign prerogative, " the proper adjudication of which might be impaired by unsettled questions of state law, see Thibodaux, 360 U.S. 25, 28 (1959); cases whose resolution by a federal court might unnecessarily interfere with a state system for the

collection of taxes, see Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293 (1943); and cases which are duplicative of a pending state proceeding, see Colorado River, 424 U.S. 800 (1976); Pennsylvania v. Williams, 294 U.S. 176 (1935).

This Court has ordered the present parties to address the issue of Thibodaux abstention. In Thibodaux, 360 U.S. 25, the plaintiff city had filed a petition for expropriation in state court, asserting a taking of land, buildings, and equipment of the defendant company.  See id. at 26.  After the defendant removed the case to federal court based on diversity jurisdiction, the federal court stayed the action to afford the supreme court of Louisiana the opportunity to address the previously uninterpreted state statute on which the city had based its expropriation.  See id. at 26.  The United States Supreme Court noted that the district judge had responded "sensibly" to the problem facing him because an opinion of the state attorney general had recently held, in a "strikingly similarly case," that another Louisiana city did not possess the same power that the plaintiff city in Thibodaux claimed to have.  See Thibodaux, 360 U.S. at 30.  At the same time, however, the uninterpreted state statute at issue appeared to grant the city such power.  See id.  In affirming the district court's decision to abstain, the Thibodaux Court stated:

> The special nature of eminent domain justifies a district judge, when his familiarity with the problems of local law so counsels him, to ascertain the meaning of a disputed state statute from the only tribunal empowered to speak definitively -- the courts of the State under whose statute eminent domain is sought to be exercised -- rather than himself make a dubious and tentative forecast.

Id. at 29.

Several courts addressing Thibodaux have reasoned that the case "is really a variant of

the <u>Burford</u> abstention doctrine and has not evolved as a separate doctrine of its own." <u>Grode</u> <u>v. Mutual Fire, Marine and Inland Ins. Co.</u>, 8 F.3d 953, 957 (3rd Cir. 1993).  In <u>Burford</u>, 319 U.S. 315 (1943), the plaintiff brought an action in federal court challenging the "reasonableness" of a decision by the Texas railroad commission to grant an oil drilling permit to the defendant oil company.  <u>See</u> <u>id</u>. at 316-317.  Through its complaint, the plaintiff sought to have the federal court determine whether the state railroad commission had properly applied Texas' complex oil and gas conservation regulations.  <u>See</u> <u>id</u>. at 331.  The defendant argued that the federal court should abstain from deciding the case because the state of Texas had an established, centralized system of review whereby state courts with "specialized knowledge" of the regulations governing the oil industry would handle review of the railroad commission's decisions.  <u>Id</u>. at 327.  Finding this system of state court review "expeditious and adequate," the Supreme Court held that federal court review of commission decisions would result in "delay, misunderstanding of local law, and needless federal conflict with the state policy [.]"  <u>Id</u>. at 334.  The Court concluded that "a sound respect for the independence of state action required the federal equity court to stay its hand[.]"  <u>Id</u>. at 334.

It is against this backdrop that the Court now confronts the cases *sub judice*.  The Court initially acknowledges "the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds."  <u>Id</u>. at 359 (citing <u>Kline v. Burke Constr. Co.</u>, 260 U.S. 226, 234 (1922)).  Thus, this Court has a strict duty to exercise the jurisdiction that is conferred upon it by Congress.  <u>See</u>, <u>e.g.</u>, <u>Colorado River</u>, 424 U.S. at 821 ("Federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them"); <u>Wisconsin v. Constantineau</u>, 400 U.S. 433, 439

(1971) ("We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it."); Meredith v. City of Winter Haven, 320 U.S. 228, 234-35 (1943) ("Denial of [the opportunity to decide questions of state law] by the federal courts merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state, would thwart the purpose of [diversity jurisdiction]."). However, federal courts may decline to exercise their jurisdiction in otherwise "'exceptional circumstances,'" where denying a federal forum would clearly serve an important countervailing interest, Colorado River, 424 U.S. at 813 (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189 (1959)), for example where abstention is warranted by considerations of "proper constitutional adjudication," "regard for federal-state relations," or "wise judicial administration," Colorado River, 424 U.S. at 817 (internal quotation marks omitted).

In the present matters, the Twenty-first Amendment to the Constitution of the United States establishes the state interest at issue – namely, the right of the state to control the importation and sale of alcoholic beverages within its border. See U.S. CONST. amend XXI. The states possess broad authority under the Twenty-first Amendment (which repealed national prohibition of the sale of alcoholic beverages), as well as inherent police powers, to regulate, restrict, or ban the sale of alcoholic beverages within their borders. See generally Granholm v. Heald, 125 S.Ct. 1885 (2005); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 514-15(1996). The authority vested to the states by the Twenty-First amendment extends beyond the regulation of alcohol to include issues intertwined with its sale and use.

See, e.g., New York State Liquor Authority v. Bellanca, 452 U.S. 714, 718 (1981) (holding that state has authority to prohibit or to regulate topless dancing in liquor-licensed establishments).

The State of Ohio has established an intricate regulatory regime to govern the sale and importation of alcoholic beverages within its borders. See, eg., OHIO REV. CODE §§ 4301-4399. The Act is an integral part of this regulatory environment.[7]

It follows *a fortiori* that these cases are not, as the defendant suggests, "ordinary diversity cases involving ordinary questions of law and fact similar to questions of fact and

---

[7]     Schieffelin & Co. contends that the Act is "not a liquor control statute; [rather] it
        is an Act to govern the commercial relationship between manufacturers and wholesalers."
        (Dkt. # 28 at 3 n.1.)  The defendant attempts to support its contention by emphasizing that
        the Act is not codified in chapter 43 of the Ohio Revised Code dealing with liquor
        regulations.  The defendant's argument is spurious at best.  While it is beyond cavil that the
        Act falls within Chapter 13 of the Ohio Revised Code (which is Ohio's codification of the
        Uniform Commercial Code), the fact that the Act is a separate provision of Ohio's UCC
        is evidence that the Ohio General Assembly deemed the relationship between alcohol
        manufacturers and distributors as requiring special statutory consideration.  In addition,
        Ohio courts routinely have held that the Act is an arm of Ohio's Liquor Control Act which
        "undertakes to create a system of control of the manufacture and importation of and traffic
        in beer and intoxicating liquors." See Tri-County Distrb., Inc. v. Brown-Forman Bev. Co.,
        91 C.A. 225, 1993 WL 150297 (Ohio App. 7th Dist. May 4, 1993) (quoting Coady v.
        Leonard, 132 Ohio St. 329 (1937)).  Hence, this Court finds the statements of Justice
        Stevens (albeit in dissent) particularly instructive:

                Today many Americans, particularly those members of the younger
                generations who make policy decisions, regard alcohol as an ordinary
                article of commerce, subject to substantially the same market and legal
                controls as other consumer products.  That was definitely not the view
                of the generations that made policy in 1919 when the Eighteenth
                Amendment was ratified or in 1933 when it was repealed by the
                Twenty-first Amendment.

        Granholm, 125 S.Ct. at 1889 (Stevens, J. dissenting).

law resolved by other courts."  (Dkt. # 28 at 2.)   Here, the United States Constitution, as amended by the Twenty-first Amendment, vests the states with virtually unfettered authority to regulate the subject matter of the present disputes.   An examination of precedent addressing the import of the Twenty-first Amendment suggests that the federal courts will intervene in this area of state prerogative only where the state's conduct potentially infringes on other constitutional rights.  See, e.g., Granholm, *supra* (Commerce Clause); Bellanca, 452 U.S. at 718 (First Amendment); North Dakota v. United States, 495 U.S. 423 (1990) (Supremacy Clause); Larkin v. Grendel's Den, Inc., 459 U.S. 116, 122, n. 5 (1982) (Establishment Clause); Craig v. Boren, 429 U.S. 190, 209 (1976) (Equal Protection).  As the parties concede that this matter does not give rise to any constitutional rights save the diversity statute, the Twenty-first Amendment compels this Court to afford substantial deference to the state's interest in resolving this matter.

The Court is mindful that federal courts, including the United States Court of Appeals for the Sixth Circuit (albeit in an unreported decision), have addressed cases arising under the Act notwithstanding the force of the Twenty-first Amendment.  However, four factors render the state interests present in case pending before this Court distinguishable from those prior courts' sporadic applications of the Act.

First, as discussed *supra*, only three federal cases have addressed the Act since the amendment to section 1333.87's jurisdictional provision.   See Dayton Heidelberg Distrib. Co., 108 F. Supp. 2d 859 (S.D. OH.), aff'd, No. 01-4061, 2003 U.S. App. LEXIS 17936 (6th Cir. Aug. 25, 2003); Jameson Crosse, Inc, 917 F. Supp. 520.  No federal case has addressed the import of this apparent grant of exclusive jurisdiction to the state courts.  Whether the

Ohio legislature attempted to vest exclusive jurisdiction over claims arising under the Act in the Ohio courts of common pleas, and the potential the consequences of the amendment (i.e., whether the amendment violates Ohio's one-subject rule, whether the parties to a franchise may contract around the Act by utilizing a forum selection clause) are questions that federal-state comity requires achieve initial resolution in Ohio's courts.

Secondly, Schieffelin & Co. advances the defense that the Act does not provide for the injunctive relief sought by the parties.  <u>See</u> (Dkt. # 23 at 2-4; Dkt. # 31 at 5-9 ).  In so doing, Schieffelin & Co. relies exclusively on the statutory text as well as the Ohio General Assembly's purported intentions when enacting several amendments to the statute.  <u>See</u> (Dkt. # 23 at 2-4).  Again, no court has addressed the issue advanced by the defendant – specifically, whether section 1333.87's reference to "damages or other such relief" includes injunctive relief.  The question as to whether the Ohio General Assembly intended to provide for injunctive relief for violations of the Act is best left to the Ohio courts.

Thirdly, the substantive issues presented in this case heretofore have not been addressed by any court.  Schieffelin & Co. initially purported to terminate the plaintiffs' franchises pursuant to section 1333.85(d), which affords a "successor manufacturer" with the right to terminate a franchise relationship absent "just cause."  <u>See</u> OHIO REV. CODE § 1333.85(D).  The parties dispute whether the termination of S&S rendered Schieffelin & Co. a "successor manufacturer" pursuant to the Act.  This Court finds no authority interpreting "successor manufacturer."  The plain text of the statute reveals, however, that the Ohio General Assembly was concerned with the effect of corporate restructuring on alcohol distribution within the state.  While one provision of the termination statute provides that a

"successor manufacturer" may terminate a franchise relationship absent just cause, see OHIO REV. CODE § 1333.85(D), another provision explicitly excludes "a manufacturer's sale, assignment, or other transfer of the manufacturers's product or brand to another manufacturer over which it exercises control" as a "just cause" rationale for termination, OHIO REV. CODE § 1333.85(B)(4).  It is the Ohio courts that sit in the best position to determine whether the Ohio General Assembly intended the corporate scenario presented by S&S and Schieffelin & Co.'s relationship to fall within the confines of section 1333.85(D) or section 1333.85(B)(4).

The final factor differentiating these cases from those previously addressed in federal fora also pertains to the parties positions regarding the applicable law.  Each prior federal case addressed "just cause" terminations, see OHIO REV. CODE § 1333.85, and, or, the parties' statutory duty to contract in "good faith," see OHIO REV. CODE § 1333.83.  The Act explicitly defines "good faith," OHIO REV. CODE § 1333.82 (E), and long-standing authority  has established a definition of "just cause," see e.g., Bonanno, Inc. v. I.S.C. Wines of California, 56 Ohio App. 3d 62, 564 N.E.2d 1105 (Ohio 2d App. Dist. 1989).  Thus, the former cases presented a straight-forward application of these definitions to the matters at hand.  However, the instant cases present the multitude of issues discussed *supra*, as well as the question as to whether Schieffelin & Co. may provide notice that it is terminating a franchise under the "successor manufacturer" exception and later provide a "just cause" alternative for the termination.  Consequently, even where these cases appear to share qualities with other scenarios addressed in federal fora, they nonetheless remain distinct.

For the foregoing reasons, this Court finds that the state of Ohio's interest in resolving

the present cases substantially outweighs the defendant's right to have these matters heard in a federal court. A court has three options when it decides to refrain from the action under the Burford/Thibodaux abstention doctrine. The court may dismiss the action, remand the action to state court if it was commenced there, or stay the action. See Quackenbush, 517 U.S. at 721.

A federal court has the authority to decline to exercise its jurisdiction when it "is asked to employ its historic powers as a court of equity." Fair Assessment in Real Estate Assn., Inc. v. McNary, 454 U.S. 100, 120 (1981) (Brennan, J., concurring). "In cases where the relief being sought is equitable in nature or otherwise discretionary, federal courts not only have the power to stay the action based on abstention principles, but can also, in otherwise appropriate circumstances, decline to exercise jurisdiction altogether by either dismissing the suit or remanding it to state court." Quackenbush, 517 U.S. at 721. As this Court has observed *supra*, the relief sought by the plaintiffs is effectively equitable in nature as the amended complaints seek preliminary and permanent injunctions, as well as declaratory relief. Accordingly, dismissal / remand is proper.

### III.    CONCLUSION

For the foregoing reasons, the Court hereby orders that it shall abstain in this matter. The Court orders that Goodman Beverage Co., Inc. v. Schieffelin & Co., 1:05CV868 is hereby **REMANDED** to the Court of Common Pleas, Lorain County, Ohio. The Court further orders that The Superior Beverage Co., Inc. v. Schieffelin & Co., 4:05CV834 is hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

/s/ Peter C. Economus - May 31, 2005
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**