# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **THE SUPERIOR BEVERAGE CO., INC.,** | ) | **CASE NO.  1:05 CV 0834** |
| | ) | |
| **PLAINTIFF,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **SCHIEFFELIN & CO.** | ) | **AND ORDER** |
| | ) | |
| **DEFENDANT.** | ) | |

| | | |
|---|---|---|
| **GOODMAN BEVERAGE CO., INC., et. al.,** | ) | **CASE NO.  4:05 CV 0868** |
| | ) | |
| **PLAINTIFF,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **SCHIEFFELIN & CO.** | ) | **AND ORDER** |
| | ) | |
| **DEFENDANT.** | ) | |

This matter is before the Court upon the Defendant Schieffelin & Co.'s Motion for Summary Judgment (5:05 CV 868, Dkt. #50; 5:05 CV 834, Dkt. #53) and Motion for Summary Judgment on the Successor Manufacturer Issue (5:05 CV 868, Dkt. #50). Also before the court is  Plaintiff Superior Beverage Co.'s Motion for Partial Summary Judgment on the Just Cause Issue (5:05 CV 834, Dkt. #55) and Motion for Partial Summary Judgment

1

on the Successor Manufacturer Issue.  (5:05 CV 834, Dkt. #62).   In addition, Plaintiff Goodman Beverage's Motion for Partial Summary Judgment on the Issue of Just Cause Termination (5:05 CV 868, Dkt. #48) and Motion for Summary Judgment on Successor Manufacturer Issue (5:05 CV 868, Dkt. #61) are before the Court.

## I.      BACKGROUND

The above-captioned actions arise from the Defendant, Schieffelin & Co.'s ("Schieffelin & Co."), efforts to terminate alcohol franchises operated by the Plaintiffs, Superior Beverage Co., Inc. ("Superior"), Goodman Beverage Co., Inc. ("Goodman"), and Mid-Ohio Wines, Inc. ("Mid-Ohio Wines"), pursuant to the Ohio Alcoholic Beverages Franchise Act (the "Act"), OHIO REV. CODE §§ 1333.82 - .87 (2005).

### A. The Corporate Identity and Structure of Schieffelin & Co.

Möet-Hennessy, S.A. ("Möet-Hennessy"), a French corporation, is the wine and spirits division of Louis Vuitton Möet-Hennessy ("LVMH"), likewise a French corporation. (Dkt. # 31 at 2). Möet-Hennessy has the right to distribute in the United States of America wines, sparkling wines, and champagnes, grown by non-party vineyard owners.  Möet-Hennessy possesses the right to distribute, *inter alia*, Dom Perignon Champagne (a product of France), Möet & Chandon Champagne (France), Domaine Chandon still and sparkling wines (California), and Casa Lapostolle wines (Chile).

Möet-Hennessy formed a wholly-owned subsidiary, Möet-Hennessy, USA, a Delaware corporation, in 1980 for the purpose of distributing wine and spirits in the United States.  (Case No. 1:05CV868, Dkt. # 25 at 6). Möet-Hennessy also acquired Schieffelin &

2

Co., a Delaware corporation having its principal place of business in New York, as an importer and wholesaler of wines. (Case No. 1:05CV868, Dkt. # 25 at 6). Möet-Hennessy caused Möet-Hennessy, USA and Schieffelin & Co. to merge, with the surviving entity being Möet-Hennessy, USA. (Case No. 1:05CV868, Dkt. # 25 at 6). Möet-Hennessy, USA later changed its name to Schieffelin & Co. (Case No.1:05CV868, Dkt. # 25 at 6). As an indirect wholly-owned subsidiary of Möet-Hennessy, Schieffelin & Co. imported and distributed Möet-Hennessy's products in the United States. (Dkt. # 31 at 2).

In 1987, Möet-Hennessy entered into an agreement with Guinness Plc, a corporation of Great Britain, whereby the parties agreed to create a joint venture to manage the marketing, distribution and sale in the United States of their various brands and spirits. (Dkt. # 31 at 2). Pursuant to the joint venture agreement, the parties created Schieffelin & Somerset ("S&S"), a New York general partnership, having two equal partners: (1) Schieffelin Partner, Inc., an indirect, wholly owned subsidiary of Möet-Hennessy; and (2) Somerset Partner Inc., an indirect, wholly owned subsidiary of Guiness Plc. (Dkt. # 31 at 2). Schieffelin & Co. transferred to S&S all of its distributorship rights relating to Möet-Hennessy brands. (Dkt. # 31 at 2).

S&S imported and sold Möet-Hennessy brands in the United States from 1988 through 2004. (Dkt. # 31 at 3). Diageo, Plc. (fka Guiness, Plc.), however, desired to terminate the S&S joint venture in order retain exclusive control over its brands. (Case 4:05CVcv834, Dkt. # 31). The parties consequently entered into an "Implementation Agreement," whereby S&S transferred the rights to Diageo, Plc. brands to Diageo North

3

America, Inc., and Möet-Hennessy brands to Schieffelin & Co.  (Dkt. # 31 at 3).  However,

Schieffelin & Co. had terminated its distributorship licenses in 1988, thereby precluding any

immediate transfer of S&S's distributorship rights in the Möet-Hennessy brands.  (Dkt. # 31

at 3). The parties ultimately agreed that they would transfer the brands on the "Schieffelin

License Date," contemplated as January 1, 2005.  (Dkt. # 31 at 3).

### B. Schieffelin & Co.'s Distributorship Agreement with Superior.

On April 27, 1988, Superior entered into an franchise whereby it became Schieffelin

& Co.'s distributor in the Ohio counties of Columbiana, Mahoning, and Trumbull.  (Case No.

4:05CV834, Dkt. # 26 at 1). Superior retained the franchise upon the creation of S&S.

### C. S&S's Distributorship Agreement with Mid-Ohio Wines and Goodman

On June 1, 1990, Mid-Ohio Wines entered into a franchise with S&S whereby Mid-

Ohio became S&S's distributor in the Ohio counties of Ottawa, Sandusky, Seneca, Wyandot,

Marion, Morrow, Crawford, Huron, Erie, Lorain, Ashland and Richland.   (Case

No.1:05CV868, Dkt. # 29).  In June 1995, Goodman, a related entity to Mid-Ohio Wines,

began to act as the exclusive distributor of S&S products in Lorain and Erie counties

purportedly with the knowledge and consent of S&S.  (Case No. 1:05CV868, Dkt. # 29).

### D. Schieffelin & Co.'s Attempted Termination of the Superior, Mid- Ohio Wines and Goodman Franchises

As anticipated upon the termination of S&S, Schieffelin & Co. applied on August 25,

2004, with the Ohio Division of Liquor Control for the license(s) required to distribute wines

within Ohio.  (Dkt. # 31 at 4). Included with Schieffelin & Co.'s application were Territory

4

Designation forms indicating that Superior, Mid-Ohio Wines and Goodman would serve as Schieffelin & Co.'s distributors within Ohio effective January 1, 2005.  (Dkt. # 31 at 3).

On March 21, 2005, Schieffelin & Co. issued a letter to each of the Plaintiffs advising that it was terminating their distributorship agreements pursuant to OHIO REV. CODE § 1333.85(D).3  (Dkt. # 31 at 4). The letters specifically provided, in pertinent part:

> On January 1, 2005, Schieffelin & Somerset Co., a New York General Partnership assigned to Schieffelin & Co., a Delaware Corporation, all of its rights and obligations relating to the distribution in the United States of Hennessy, Moet & Chandon, Dom Perignon, Domain Chandon, Terrazas, Chandon Fresco, Green Point, Ruffino, Grand Marnier, Marnier, Chateau de Sancerre, Lapostolle and Casa Lapostolle and Navan.
>
> This letter will serve as notice that, in accordance with Ohio Revised Code Section 1333.85(D), the relationship between Schieffelin & Co. and [Superior, Mid-Ohio Wines, and Goodman] is hereby terminated effective the close of business on March 30, 2005.
>
> As of such date, Schieffelin & Co. will no longer supply you with any alcohol beverage products. Also, as of that date, Schieffelin & Co. will repurchase your remaining inventory of alcohol beverages that we supplied to you and that are in marketable condition for resale at your laid-in cost.
>
> A company representative will contact you shortly to discuss statutory compensation under Section 1333.85(D).

(Case No. 1:05CV868, Dkt. # 1, Ex. A).

### E. The Goodman / Mid-Ohio Wines's State Action

On March 28, 2005, Goodman and Mid-Ohio Wines filed an action in the Court of Common Pleas, Lorain County, Ohio against Schieffelin & Co. asserting violations of the Act.  (Case No. 1:05CV868, Dkt. # 1, Ex. A). Goodman and Mid-Ohio Wines additionally sought a temporary restraining order and preliminary injunction to "prohibit Defendant

Schieffelin & Co. from terminating the franchise rights of [p]laintiffs [and] to continue to distribute certain alcoholic beverages supplied to them by the Defendant." (Case No. 1:05CV868, Dkt. # 1, Ex. B).

The parties entered into a stipulated temporary restraining order on March 30, 2005, effectively maintaining the status quo until the state court addressed the motion at an oral hearing scheduled for April 7, 2005.

### F. The Superior Action

Superior meanwhile filed its action against Schieffelin & Co. in this Court, likewise asserting violations of the Act and requesting a temporary restraining order. (Case No. 4:05CV834, Dkt. # 1, Dkt. # 3). This Court granted the motion for a temporary restraining order and scheduled the matter for a preliminary injunction hearing to be held on April 8, 2005. (Case No. 4:05CV834, Dkt. # 4).

### G. Subsequent Procedural History

Schieffelin & Co. thereafter filed a Notice of Removal in the Goodman/Mid-Ohio Wines action in an effort to consolidate the related proceedings. (Case No. 1:05CV868, Dkt. # 1). The parties to each action stipulated to an extension of the temporary restraining order in all cases until a June 2, 2005, preliminary injunction hearing.

### H. Schieffelin & Co.'s April 29, 2005 Letters

Schieffelin & Co. issued letters to each of the plaintiffs on April 29, 2005, providing in pertinent part:

As you know, as of January 1, 2005, Schieffelin & Co. acquired the rights to various

6

brands . . . .Prior to January 1, 2005, [S&S] had the right to the MH [Möet-Hennessy] Brands.  [S&S] had concluded that it was in the best interest . . . that they be consolidated with one distributor in the State of Ohio, specifically Glazer's Distributors of Ohio, and its affiliated entities. [S&S] based this conclusion on a number of factors, including:

1. Glazer's elects to purchase at DI [direct import] pricing, which is lower than the prices at which your company elects to purchase from the warehouse in New Jersey. Consequently, Glazer's can sell at a lower price – and a uniform price – throughout the state.
2. Glazer's has relationships with national and statewide chains, so the MH Brands could be featured more often in advertising placed by national and statewide chains.
3. Glazer's sells a higher volume of the MH Brands.  Consequently, Glazer's is better able to carry current vintage and current packaging.
4. Glazer's can offer statewide training.
5. In our view, Glazer's offers a more focused and better trained sales team than your company.
6. In our view, Glazer's has a greater likelihood of increasing the volume of sales of the MH Brands.

Following the transfer of the MH Brands to Schieffelin & Co., we decided to follow through on the decision to consolidate the MH Brands with Glazer's. Rather than exercise our right to terminate for cause under the [Act], Schieffelin & Co. decided to exercise its right to terminate your Franchise pursuant to the terms of Section 1333.85(D). We believed that our right to terminate under that Section was clear. Moreover, in view of your many years of representing the MH Brands, we believed that a termination pursuant to 1333.85(D) would provide you with appropriate compensation for your loss of the MH Brands.  Although we have now provided you with or offered to make available all of the documentation necessary for you to make your determination that, in fact, the rights to the MH Brands were transferred from one legal entity ([S&S]) to a different legal entity not under the same control (Schieffelin & Co.), you have persisted in insisting that Schieffelin & Co. does not have the right to terminate your Franchise pursuant to Section 1333.85(D).  We understand that a termination other than pursuant to Section 1333.85(D) requires just cause. We also understand that just cause has been defined to mean the exercise of business judgment that is "neither arbitrary nor without reason." (Citation omitted.)
. . . .
Our decision to issue this termination letter is neither arbitrary nor without reason. We are terminating your Franchise for cause for the reasons outlined above. The termination outlined in this letter will take effect 60 days from the date of this letter, unless the Franchise is earlier terminated pursuant to a court ruling in the pending

7

litigation.

(Case No. 1:05CV868, Dkt. # 20, Ex. A ).

### I. The Instant Proceedings

Schieffelin & Co. asserts two justifications for terminating the franchises.  First, Schieffelin & Co. claims that it terminated the franchises for just cause.  In the alternative, Schieffelin & Co. argues that it is a successor manufacturer, and as such has the right to terminate the franchises without demonstrating just cause.  Plaintiffs contest both arguments. First, they contend that Schieffelin & Co. is not a "successor manufacturer" and that even if it is, it failed to terminate its relationships with the Plaintiffs within 90 days of the transfer of control, and therefore cannot terminate without cause under the "successor manufacturer" exception.  Second, the Plaintiffs respond that the Defendant did not have just cause for termination and that it failed to meet the statutory notice requirements for termination for cause.  Plaintiffs additionally allege that the Defendant failed to act in good faith.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only where there lacks a genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 321.  The moving party must demonstrate to the Court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. Id. The burden on the non-moving party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. Celotex Corp., 477 U.S. at 324. The inquiry for the Court is whether "there are any genuine factual issues that

8

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250.  In short, "[t]he respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 250).

## III.    LAW AN ANALYSIS

### A.    Just Cause Termination

Schieffelin & Co. first argues that it had just cause to terminate its franchise relationship with Goodman and Superior, choosing to use Glazers Distributors of Ohio ("Glazers") as its distributor instead.[1]  The Act affords Ohio beer and wine distributors unique protections.  Under the Act, manufacturers of alcohol must "offer in good faith to its distributors a written franchise" regarding the distribution of alcoholic brands, and that if a manufacturer does business with a distributor for more than ninety days without a written contract, a franchise is automatically created. OHIO REV. CODE ANN. § 1333.83 2007. The Act requires both manufacturers and distributors to "act in good faith."  OHIO REV. CODE ANN. § 1333.84 2007.  Termination for cause under Ohio Revised Code § 1333.85

---

[1]

The parties concur that Ohio law governs this action.  (Dkt. #40, p.3; Dkt. #42, p.3.) Accordingly, this Court must apply Ohio law in accordance with the controlling decisions of the Supreme Court of Ohio.  Grantham & Mann v. American Safety Prods., 831 F.2d 596, 608 (6th Cir. 1987).

is a two-step inquiry.  After determination of "just cause" is made as to the Defendant's proffered reasons for termination, it must be established that the Defendant provided "at least sixty days' written notice to the other party setting forth the reasons for … cancellation." OHIO REV. CODE ANN. § 1333.85 (2007).

### 1.  Just Cause

Plaintiffs maintain that Schieffelin did not have just cause to terminate their respective franchises as required under Ohio Revised Code § 1333.85. Case No. 1:05CV868 (Dkt. #51, 6).  The statute itself does not define just cause, but Ohio courts and federal courts sitting in Ohio have "determined it to be a requirement of minimum rationality and business purpose." Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc., 74 Fed. Appx. 509, 512-513 (6th Cir. 2003).  In other words, the Act "does not require business people to act irrationally or counter to their best interest."  Excello Wine Co. v. Monsieur Henri Wines, 474 F. Supp. 203, 210 (S.D. Ohio 1979).  "A manufacturer remains free to exercise a business judgment in determining to cancel or withhold a franchise." Caral Corp. d/b/a Heidelberg Distrib. Co. v. Taylor Wine Co., 1980 U.S. Dist. LEXIS 17753, at *13 (S.D. Ohio July 15, 1980).  A court "cannot second-guess that judgment, and the Ohio Act does not require it to do so." Excello, 474 F. Supp. at 210.  Just cause requires merely a bare business judgment, and not even a "good and well reasoned business judgment...the only legal requirement is that the decision not be arbitrary and without reason."  Bonanno, 564 N.E.2d at 1109.

Courts have upheld the termination of a distributorship for just cause in the cases where the franchisee fails to meet national and state average levels for sales.  See Dayton

Heidelberg, 108 F. Supp. 2d 859, 864; Francis A. Bonanno, Inc. v. ISC Wines of California, 564 N.E.2d 1105, 1108 (Ohio Ct. App. 1989). Even when sales were increasing, one court found that there was cause for franchise termination when there was a history of late payments by the distributor, the distributor displayed an "antagonistic and even truculent attitude" toward the manufacturer, and the distributor refused to market several brands while simultaneously marketing competitive brands. Excello Wine Co. v. Monsieur Henri Wines, Ltd., 474 F. Supp. 203 (S.D. Ohio 1979).

As the Sixth Circuit pointed out in Dayton Heidelberg, "only where the manufacturer's business dissatisfaction is entirely arbitrary is just cause lacking." Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc., 74 Fed. Appx. 509, 513 (6th Cir. 2003). For example, a franchisee's failure to maintain a sixty-day supply, when there is no reason to keep such supply, lack of interest by a franchisee in supporting manufacturer's other lines, and failure to send a representative to a manufacturer's meetings, when there was no indication that these were mandatory, were not just cause. AB&B Inc. v. Banfi Products, Inc., 594 N.E.2d 1151, 1154 (Ohio Ct. App. 1991).

The Parties appear to dispute the applicable standard for just cause termination. Plaintiffs argue that the above case law requires that a manufacturer demonstrate "fault or wrongdoing by the franchisee," and Schieffelin & Co. is unable to meet this requirement. (Dkt. #58, 834). Schieffelin & Co. asserts that it need not provide evidence of fault or wrongdoing on the part of Plaintiffs in order to demonstrate just cause, as the "only legal

11

requirement is that the decision not be arbitrary and without reason." See Bonanno, supra, 56 Ohio App. 3d at 63, 564 N.E.2d at 1106.  Although Schieffelin & Co. supports its interpretation of the just cause standard with a lengthy discussion of burden shifting and the intent of the Ohio General Assembly, the Court declines to complicate the analysis any more than necessary.  It is clear from the case law in both state and federal courts that only where the manufacturer's business dissatisfaction is entirely arbitrary is just cause lacking.  See Caral, 1980 Dist. Lexis 17753, at *13.  Plaintiffs' interpretation of the standard as requiring the manufacturer to demonstrate fault or wrongdoing is misleading.  Although the manufacturer may meet its burden by pointing to wrongdoing on behalf of the franchisee, the case law only requires bare business judgment.

Under this standard, Schieffelin & Co. had just cause terminate the franchises.  It is not the province of this Court to engage in a detailed analysis of Schieffelin & Co.'s business decisions regarding the termination of Plaintiffs' franchises.  Instead, this Court must assess whether Schieffelin & Co. reasons are rooted in "minimum rationality and business purpose." Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc., 74 Fed. Appx. 509, at 513. Schieffelin & Co. chose to replace Goodman and Superior with Glazer's because Glazer's had relationships with national and statewide chains and had better employee training programs. Schieffelin & Co. further alleges that Plaintiffs could not carry current vintages or packaging because of their lower volumes of sales.  In addition, Schieffelin & Co. points out that Plaintiffs did not purchase wines directly from the importer in France, a practice

referred to as "direct import" pricing, instead choosing to purchase via a warehouse in New Jersey at a higher price.  Because Plaintiffs bought the wine at a higher price, it in turn cause them to sell Schieffelin & Co. products at a higher price.

It was entirely rational and business-related for Schieffelin & Co. to transfer the franchise to another Ohio franchisee for the above reasons.  Even if, as Plaintiffs contend, their sales were not down, and the new franchisees have no more success than the old, this will not deprive Schieffelin & Co. of just cause.   See Excello Wine Co. v. Monsieur Henri Wines, Ltd., 474 F. Supp. 203 (S.D. Ohio 1979).  In the absence of facts indicating that Schieffelin & Co.'s reasons for termination were arbitrary and lacking minimum rationality, the Court finds that the reasons given for termination constitute just cause as a matter of law.

### 1. Notice

However, even though Schieffelin & Co. demonstrated just cause for termination of Plaintiffs' franchises, it did not comply with the statutory notice provisions required by the Act.  The Act provides that, "no manufacturer or distributor shall cancel or fail to renew a franchise... for other than just cause and without at least sixty days' written notice to the other party setting forth the reasons for such cancellation, failure to renew, or substantial change."  OHIO REV. CODE ANN. § 1333.85 (2007).  Schieffelin & Co. first attempted to terminate the Plaintiffs' franchises in the March 21, 2004, letter, invoking the successor manufacturer exception under the Act.  (Case No. 1:05CV868, Dkt. #1-2, ¶15).  Schieffelin & Co. maintains that the March 21 notice constitutes notice of termination for the purpose

13

of just cause termination, and, therefore, that when it terminated the Plaintiffs' franchises on June 7, 2005, it did so only after providing more than sufficient notice. (Case No. 1:05CB868, Dkt. #53, 2-3).

Plaintiffs counter, asserting that the March 21 letter does not constitute sufficient notice for just cause termination because Schieffelin & Co. only cite the successor manufacutrer exception as its reason for terminating the franchise.  It was not until the April 29, 2005, letter, Plaintiffs point out, that they were first put on notice that Schieffelin & Co. was terminating their franchises for cause.  Therefore, Plaintiffs argue that because the April 29 letter arrived only 39 days before the Plaintiffs' franchises were terminated, it does not meet the sixty day requirement under the Act.

Schieffelin & Co. argues that substantial compliance with the notice requirement is acceptable under the Act, and that the March 21 letter therefore constitutes sufficient notice despite the fact that Schieffelin & Co. only invoked the successor manufacturer exception. As an initial matter, the Court notes that there is no case law in Ohio that addresses the notice requirement under the Act, and the legislative history is not instructive.  In the absence of case law and legislative history, Schieffelin & Co. looked to statutory notice provisions in other Ohio statutes for guidance.  For example, Schieffelin & Co. cites <u>City of Parma v. PUCO</u>, 86 Ohio St. 3d 144, 147 (1999), a case involving a statute that required the Public Utilities Commission of Ohio ("PUCO")  to publish notice of a hearing no less than 15 days before the hearing.  The court held that although PUCO only published the notice four days

14

before the hearing, the notice was sufficient because PUCO substantially complied with the statue.  City of Parma 86 Ohio St. 3d at 149.

The statute in City of Parma is readily distinguishable from the notice provision in the Act because the former statute explicitly provided that substantial compliance with the notice provision is sufficient.  The Act, however, contains no such provision allowing for substantial compliance.  In the absence of any evidence that the legislature intended to allow for substantial compliance, let alone "clear and unequivocal legislative intent," this Court declines to adopt Schieffelin & Co.'s interpretation of the notice provision.

As a result, the March 21 letter did not constitute adequate notice under the Act because it did not set forth the reasons for termination.  Because the April 29 letter invoking just cause termination was received by Plaintiffs only 39 days before termination of the franchises, Schieffelin & Co. has not complied with the sixty day notice period required by the Act.  Accordingly, the Court finds that even were Schieffelin & Co. able to demonstrate just cause, it has failed to comply with the statutory notice provisions in the Act.

**B.    Successor Manufacturer Exception**

Schieffelin & Co. argues that even if the Court finds that just cause has not been established, it is excused from the just cause requirement because it is a successor manufacturer under the Act.  A successor manufacturer may terminate a franchise relationship without demonstrating just cause if it gives notice of termination within ninety days of the acquisition of a particular brand or "substantially all of the stock or assets of

15

another manufacturer."  OHIO REV. CODE ANN. § 1333.85(D) 2007.  Specifically, R.C.

133.85(D) provides:

> If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand.  Any notice of termination or nonrenewal of the franchise to a distributor of the acquired product or brand shall be received at the distributor's principal place of business within the ninety-day period. If notice is not received within this ninety-day period, a franchise relationship is established between the parties. If the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal.

ORC Ann. 1333.85(D).

## 1.        Successor Manufacturer

Schieffelin & Co. claims that although Schieffelin Partner was an equal partner in S

& S, a supervisory committee controlled the partnership and was responsible for the major

decision-making.  Because S & S was a separate entity, Schieffelin & Co. argues, it became

a successor manufacturer when it acquired the distribution rights to the Möet-Hennessy

brands from S & S on July 1, 2004.  As a result, Schieffelin & Co. asserts that it can

terminate the franchise agreement under § 1335(D) without just cause.  Goodman and

Superior counter, asserting that Scheffelin is not a successor manufacturer because the

transfer of rights to the Möet-Hennessy Brands from S & S to Scheifflin  was a corporate

restructuring of Möet-Hennessy S.A.  Specifically, Goodman and Superior argue that

because Möet-Hennessy owned Schieffelin Partner, which in turned owned 50% of S & S,

16

Möet-Hennessy maintained control of the right to distribute the Möet-Hennessy brands.

The term "successor manufacturer" has not been defined by the Ohio Legislature. Therefore, the Court must determine what the legislature meant when it used this term. Christe v. GMS Mgt. Co., Inc., 88 Ohio St. 3d 376, 377 (2000). The starting point for determining intent is "the language in the statute and the purpose to be accomplished." Christie, 88 Ohio St. 3d at 377. If the language is plain, unambiguous, and conveys a clear and definite meeting, then there is no need to rely on other rules of statutory interpretation. If the language is not clear and unambiguous, then the court must consider other factors such as the circumstances surrounding the enactment, the spirit of the statute, public policy, and the consequences of policy interpretation. Christie, 88 Ohio St. 3d at 377.

The language of § 1333.85 is not entirely clear and unambiguous. Although the Court has already addressed the issue of whether Schieffelin & Co. had just cause to terminate the franchises, the sections of the Act dealing with just cause termination are instructive with respect to the legislature's intent to prohibit certain conduct and its understanding of the term "successor manufacturer." For example, Section 1333.85(B)(2) states that "the restructuring … of a manufacturer's business organization" is not just cause for termination of a franchise. Moreover, § 1333.85(B)(4) states that the sale or other transfer of a brand to another manufacturer under common control is not just cause for termination. As the court noted in InBev USA LLC v. Hill Distributing Company, "these provisions demonstrate a clear legislative intent to deny manufacturers the ability to terminate franchises due to corporate

17

reorganizations or the shifting of brands among entities under common control.  No. 01-4061, 2003 U.S. App. LEXIS 17936, at *5 (6th Cir. 2003).  The <u>InBev</u> court also pointed out that Section 1333.85 (B) (2) expressly states that "the restructuring, other than in bankruptcy proceedings, of a manufacturer's business organization" does not constitute just cause for termination of a franchise.  § 1333.85(B)(2).  <u>Id.</u>

    <u>InBev</u> involved the corporate reorganization of InBev Belgium's United States operations.  Labatt USA, Beck's North America ("BNA"), and the Latrobe Brewing Company ("Latrobe") were wholly owned subsidiaries of InBev Belgium.  In successive transactions, Labatt and BNA were merged into Latrobe and then Latrobe's name was changed to InBev USA.  Subsequently, InBev Belgium and InBev USA merged to form one brewing and importing company under the name InBev USA.  The <u>InBev</u> defendants had a franchise agreement with Labatt USA that was governed by the Act.  After Labatt USA merged into InBev USA, it terminated the franchises it had with the defendants, arguing that it was a successor manufacturer.  <u>Id.</u>, at *5.  The court found that because "no assets, liabilities, products, or brands were transferred to any new ownership group," the merger of companies into InBev USA was a corporate restructuring.  As the district court pointed out, InBev USA's own documents admitted as much by calling the merger a "reorganization by InBev of Belgium of its United States operations," and a "streamlining of its US corporate structure." <u>InBev USA LLC v. Hill Distributing Company</u> (S.D. Ohio, April 3, 2006), Case No. 2:06-cv-0298, Dkt. #56.  In considering InBev's argument that the merger was not a

18

restructuring because Labatt USA and BNA were eliminated by the merger, the District

Court stated that:

> InBev USA's interpretation would create an enormous loophole in the statutory prohibition of termination based on intra-corporate restructuring. Under InBev USA's interpretation, corporations could simply create new entities, contrive meaningless sales or paper mergers, and then terminate franchise agreements at will. InBev USA argues that this result was intended by the legislature because § 1333.85(D) requires a manufacturer to compensate a distributor for the diminished value of its business.
>
> InBev USA's argument is not persuasive...it would not make sense for § 1333.85(D) to condition termination rights on a "merger or acquisition," if a contrived sale and/or paper merger, like the merger in this case, qualified. If the legislature truly intended to grant manufacturers the ability to buy their way out of franchise agreements by paying the distributor for the diminished value of its business, it would have simply said so. Plaintiff's interpretation must be rejected because it is inconsistent with the purpose and spirit of the Franchise Act and contrary to the legislature's apparent intended meaning of the term "successor manufacturer."

Id.

Plaintiffs contend that Möet-Hennessy, through Schieffelin Partner, retained control

of the Möet-Hennessy brands at all times, and the transfer of brands from S&S to Schieffelin

& Co. was a corporate restructuring similar to that in InBev. (Case No. 1:05CV868, Dkt. #61

at 13). Plaintiffs point to the fact that when S&S owned the Möet-Hennessy brands, Diageo

and Möet-Hennessy brands had separate profit and loss statements, giving Möet-Hennessy

control over the Möet-Hennessy brands even though S & S technically had the right to

distribute. Id. at 4. Diageo and Möet-Hennessy also had separate policies concerning the

creation of new products, and kept their competitive information regarding the products

19

separate. Id. at 15.  Goodman argues that, "just as in the Wizard of Oz," Möet-Hennessy was "the man behind the curtain" controlling the rights to the Möet-Hennessy brands through its ownership of Schieffelin & Co. Partner.

Schieffelin & Co. points out that InBev Belgium, the parent company, retained control of the brands both before and after the corporate restructuring.  In other words, all businesses in the corporate family maintained the right to distribute the brand at issue. Schieffelin & Co., however, transferred the exclusive right  to distribute the Möet-Hennessy brands to S & S in 1988.  Although Schiefflin Partner was owned by Möet-Hennessy, Schiefflin Partner comprised only 50% of the partnership.  Diageo, a completely separate company, owned the other half of the S & S partnership.  In the InBev case there was never another separately owned player.  Although Schiefflin Partner had equal rights in the partnership, the language of the partnership agreement indicates that a supervisory committee, composed of members from both Guinness/Diageo and Möet-Hennessy, was responsible for all "major decisions." The term "major decisions" was defined in Annex 2 of the partnership agreement to include: approval of operating budgets; approval of long-term strategic plans; approval of purchases or leases of substantial assets of the distribution division of Schieffelin & Co.; approval of changes in products to be distributed, the location of offices, or the priority assignment of brands by the distribution division of Schieffelin & Co.; and approval of reorganization of distribution networks.  (5:05 CV 868, Dkt. #5068).

S & S had exclusive control over the distribution of the Möet-Hennessy brands when Scheifflin transferred those rights in 1988.  Schieffelin did not participate in the distribution

20

of the Möet-Hennessy brands until S & S dissolved in 2004 and Schieffelin obtained a license from the State of Ohio to distribute the brands.  In fact, Schieffelin did not even have the ability to terminate the franchise relationship it had with Goodman and Superior without the approval of S & S's supervisory committee, comprised of members appointed by Diageo. Diageo's ownership of half of the S & S partnership distinguishes the instant matter from InBev, where intra-corporate restructuring took place entirely within the same corporate family.  The transfer of rights to distribute the Möet-Hennessy brands from S & S to Schieffelin & Co. was not "a contrived sale and/or paper merger." InBev.  As a result, the Court finds that Scheffelin is a successor manufacturer under the Act as a matter of law.

### 2.    Notice

Although a successor manufacturer need not demonstrate just cause under the Act, written notice must be given "within ninety days of the date of the acquisition, purchase, or assignment in order for the successor manufacturer exception to apply." OHIO REV. CODE ANN. § 1333.85(D) 2007.  The parties are in dispute over when the ninety day time period was triggered.  Plaintiffs aver that the ninety day period began on July 1, 2004, because that is the day the implementation agreement unwinding the S & S partnership ("Implementation Agreement") was signed.  Schieffelin & Co. claim that January 1, 2005 triggers the ninety day period because that is the date when Schieffelin & Co. obtained a license to distribute the Möet-Hennessy brands in the state of Ohio, making the transfer of Möet-Hennessy brands effective. Schieffelin & Co. sent Plaintiffs letters on March 21, 2005, notifying Plaintiffs of its intent to terminate the franchise relationships effective March 30, 2005. If July 1, 2004

triggers the notice period, as Plaintiffs assert, then the termination letter was sent after the 90-day period, and is thus not effective.  If the date is January 1, 2005, as Defendant claims, then the letter of termination was sent within ninety days and is valid.

Although the parties engage in a detailed debate about whether Schieffelin & Co. & Co. had "common control" over the right to distribute Moet Hennesy brands between July 1, 2004 and January 1, 2005, the Court does not need to look beyond the statute.  According to the statue, written notice must be given "within ninety days of the date of the acquisition, purchase, or assignment in order for the successor manufacturer exception to apply."  OHIO REV. CODE ANN. § 1333.85(D) 2007.  The Implementation Agreement states:

> On the later of the Schieffelin License Date and the Effective Date, S & S shall cease marketing and distribution of the [Möet-Hennessy] Products and Schieffelin Co or one of its Affiliates shall commence marketing and distribution of the [Möet-Hennessy] Products.

(Dkt. #59, Exh. G).

The Schieffelin License date was defined in Article I of the Implementation Agreement as "the date on the first monthly balance sheet of S & S... following the date as of which Schieffelin & Co. has obtained all federal, state or other licenses required for Schieffelin & Co. to market and distribute the [Möet-Hennessy] Products.  (Dkt. #59, Exh. G).  The Implementation Agreement made it clear that S & S had the right to market and distribute the Möet-Hennessy Brands until Schieffelin & Co. obtained the necessary licence.  (Dkt. #59, Exh. G, Section 3.1).

Neither Party disputes the fact that Schieffelin & Co. obtained the necessary license

22

to distribute the Möet-Hennessy Brands on January 1, 2005.  (Dkt. #62, Ex. B). Schieffelin & Co. did not have the right to distribute the Möet-Hennessy brands until it obtained the necessary liscensure, making January 1, 2005, the date that Schieffelin & Co. acquired "a particular product or brand of alcoholic beverage from another manufacturer."  OHIO REV. CODE ANN. § 1333.85(D) 2007.  Therefore, Schieffelin & Co. had ninety days from January 1, 2005 to provide Goodman and Superior with written notice of termination of the franchise.  Schieffelin & Co. sent Goodman and Superior written notice on March 21, 2005, within ninety days of the acquisition of the right to distribute the Möet-Hennessy Brands.  (5:05 CV 868, Dkt. #61, Exh. A).  As a result, the Court finds that Schieffelin & Co.'s notice was timely under the Act.

C.    Good Faith Claim

The Plaintiffs also allege that Schieffelin & Co. failed to act in good faith when it issued the letters dated April 29, 2005, terminating their franchises "for cause."  (Case No. 4:05CV834, Dkt. #55, ¶12).  Specifically, Superior asserts that Schieffelin & Co.'s attempt to terminate for cause was a pretext, the actual motive of which was to intimidate the Plaintiffs into dropping their suits against Schieffelin & Co.'s attempt to terminate their franchises under the successor manufacturer exception.  Section 1333.84(A) of the Act imposes upon a manufacturer the duty of acting in good faith in its dealings with its distributors.  Ohio courts have indicated that a manufacturer acts without good faith when it coerces or intimidates a distributor.  See AB&B, Inc. v. Banfi Products, Inc., 71 Ohio App. 3d 650, 654, 594 N.E.2d 1151, 1153 (1991).  In the instant matter, there is no evidence that

the Defendant in any manner intimidated or coerced the Plaintiffs.  Therefore, Plaintiffs have

not demonstrated that Schieffelin & Co. failed to act in good faith as a matter of law.

## V.    CONCLUSION

Accordingly, the Court finds that Defendant did not have just cause to terminated

Plaintiff's franchises under the Act because it failed to comply with the statutory notice

provisions.  Therefore, Plaintiffs' Motions for Partial Summary Judgment on the Just Cause

Issue are **GRANTED.**  (5:05 CV 834, Dkt. #55); (5:05 CV 868, Dkt. #48) and Defendant's

Motion for Summary Judgment on the Issue of Just Cause is **DENIED.**  (5:05 CV 868, Dkt.

#50; 5:05 CV 834, Dkt. #53).

However, the Court finds that Defendant's termination of Plaintiff's franchises was

valid under the successor manufacturer exception to the Act.  Therefore, Plaintiffs' Motions

for Partial Summary Judgment on the Successor Manufacturer Issue are **DENIED** (5:05 CV

834, Dkt. #62); (5:05 CV 868, Dkt. #61) and Schieffelin & Co.'s Motion for Summary

Judgment on the Successor Manufacturer Issue is **GRANTED** (5:05 CV 868, Dkt. #50).

Schieffelin & Co. is thus entitled to terminate its franchise with Plaintiffs under the successor

manufacturer exception under the Act.

The Court further orders that Plaintiff Goodman Beverage Co's Motion to Certify

Question of Law to the Ohio Supreme Court is **DENIED AS MOOT**.   (5:05 CV 868, Dkt.

#52)**.**

The only issue remaining before the Court is statutory compensation under ORC Ann.

1333.85(D).  As there are no substantive issues remaining and the Court has determined the

24

rights and liabilities of the Parties, there is no just reason for delay.


   **IT IS SO ORDERED.**


                                        <u>**/s/ *Peter C. Economus* - September 20, 2007**</u>
                                            **PETER C. ECONOMUS**
                                            **UNITED STATES DISTRICT JUDGE**